1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )
4            Plaintiff,              )   Case No. 3:18-cr-00319-JO-5
                                     )
5        v.                          )
                                     )
6   RYAN ANTHONY NEGRINELLI,         )   April 11, 2019
                                     )
7            Defendant.              )   Portland, Oregon
    _____ )

8

9

10

11

12

13    **Detention Hearing**

14    TRANSCRIPT OF PROCEEDINGS

15    BEFORE THE HONORABLE ROBERT E. JONES

16    UNITED STATES DISTRICT COURT SENIOR JUDGE

17

18

19

20

21

22

23

24

25

```
 1
 2                                    APPEARANCES
 3

 4   FOR THE PLAINTIFF:      Ms. Leah K. Bolstad
                             United States Attorney's Office
 5                           1000 S.W. Third Avenue, Suite 600
                             Portland, OR 97204
 6

 7

 8   FOR THE DEFENDANT:      Ms. Dianna J. Gentry
                             Attorney at Law
 9                           6500 S.W. Macadam Avenue, No. 300
                             Portland, OR 97239
10

11                           Mr. Matthew A. Schindler
                             Attorney at Law
12                           501 4th Street, No. 324
                             Lake Oswego, OR 97034
13

14

15   COURT REPORTER:        Bonita J. Shumway, CSR, RMR, CRR
                             United States District Courthouse
16                           1000 S.W. Third Ave., Room 301
                             Portland, OR  97204
17                           (503) 326-8188

18

19

20

21

22

23

24

25
```

(P R O C E E M D I N G S)

(April 11, 2019; 11:38 a.m.)

THE COURT:  Everybody have a seat, please.

Counsel.

MS. BOLSTAD:  Good morning, Your Honor.  Leah Bolstad for the United States.  We're here in the matter of United States versus Ryan Anthony Negrinelli.  His case is 18-cr-319.  He is the fifth defendant listed in the case.

The government is here today responding to some arguments made by the defense in a recently filed motion for release.  The motion was 36 pages, and today the government filed a supplemental memorandum.  Ours is 11 pages.  I hope the Court had an opportunity to review that supplemental memorandum.

THE COURT:  I did.  I read it carefully.

MS. BOLSTAD:  Updated in that memorandum is some specifics about Mr. Negrinelli's conduct in this case involved in the kidnap and the murder of Robert Huggins.  There's additional specifics that were provided in that memo today.

Also, we updated some procedural background with respect to the other defendants in this case.  To date, everybody charged with the murder and kidnap of this victim has been detained, and every other judge to hear the matter has ordered the detention.  Including for this defendant, two separate magistrate judges have ordered him detained.  In large

1   part, that is because of the nature of the charges, the nature

2   and seriousness of kidnap and murder and violent crimes in aid

3   of racketeering.

4           This Court released Mr. Hause.  You'll recall that

5   hearing.  I was not present for that hearing, but my co-counsel

6   was here, and the huge difference with Mr. Hause is that he was

7   not involved in murder and he was not alleged to have

8   participated in that kidnap and murder that this defendant was.

9           So for all the reasons listed in our memorandum, the

10  government is asking you to detain this defendant despite --

11  despite the community support that he has and his otherwise

12  good record in the community.  The government acknowledges

13  that.  This defendant does not have a criminal history.  But

14  his first involvement in the criminal justice system, he's

15  engaged in perhaps one of the worst crimes a person can commit.

16  It was not a spur-of-the-moment crime.  It was a premeditated,

17  planned hunt for somebody who had angered the very group that

18  he was a part of.

19          He was not a victim.  This is not a victim, although

20  he portrays himself to be a victim of circumstances.  This

21  defendant helped participate in that planned manhunt and the

22  brutal torture murder of Bobby Huggins.

23          Much like there are good things to say about

24  Mr. Negrinelli, there are people, including Mr. Huggins' family

25  members, who will never see him again.  They have a lot of

1    positive things to say about Robert Huggins, a father, a

2    grandfather who did a lot of positive things in his own family

3    and in his own community.  You're not going to see that here

4    today.   Instead you're looking at all the positive things that

5    Mr. Negrinelli has done.  But to the extent the defense blames

6    the victim for what happens or that he had it coming or

7    deserved it, I think that that's really far afield here.  The

8    issue for this Court is to decide whether this defendant can be

9    released on conditions.  And given the nature and seriousness

10   of the offense, and Pretrial's recommendation of detention, the

11   government is asking this Court to detain the defendant.

12          In my memo I said I would present you with some

13   photographs.  This is how Mr. Negrinelli has presented himself

14   to the world.  This was his publicly available Facebook page.

15   So in contrast to all of the people who say he has nothing to

16   do with this violent organization, Mr. Negrinelli's own public

17   Facebook page puts himself out to the world as a member wearing

18   the colors, flipping off the camera, riding motorcycles, and

19   being very much a part of this organization.

20          I'll forward that to the Court.  (Handing.)

21          And as to the defendant's motion, I don't have

22   anything to say, but I may wish to respond to anything they

23   argue now.

24          THE COURT:  Well, I want you to please state what

25   proof you have, without identifying your witnesses, as to what

1    this defendant did as far as the torture murder is concerned.

2              MS. BOLSTAD:  Yes, Your Honor.

3              Cooperating witnesses will testify at trial that this

4    defendant participated in the torture by helping to grab

5    Mr. Huggins in a driveway in Portland, Oregon, and put him into

6    a Suburban, where Mr. Negrinelli and four other co-conspirators

7    drove Mr. Huggins' body -- his beaten body at that time, but he

8    was still alive -- up to Woodland, Washington.  During that

9    transport, Mr. Negrinelli admits in post-arrest statements that

10   he heard one other co-conspirator rack a firearm.

11             Mr. Negrinelli himself --

12             THE COURT:  What does that mean, "rack a firearm"?

13             MS. BOLSTAD:  To make sure it's loaded and rack it, a

14   pistol, Your Honor.

15             THE COURT:  Go ahead.

16             MS. BOLSTAD:  So he did not actually see it,

17   according to his postings.

18             THE COURT:  But what did he do specifically?

19             MS. BOLSTAD:  Well, he continued to go in that car

20   ride after beating a person in a driveway.  He continued.

21             He continued, when they arrived in Woodland,

22   Washington, to help get Bobby Huggins out of the Suburban and

23   get him situated in a shed.  He continued at that point.  He

24   didn't disengage and say, "I want to get out of here."  He

25   instead, by his own admission, hit the victim several times.

1  He hit the victim in the vehicle on the way there and he hit

2  the victim in that shed.

3          He also classified what he did as, "I blasted him a

4  few times."  I think we would have to just infer what he means

5  by "blasted him a few times."

6          Witnesses, besides his own admissions, would say that

7  Mr. Negrinelli assisted in waterboarding the victim; that is to

8  take a cloth and put it over Mr. Huggins' face and pour water

9  down him, down his face, causing a choking reaction.  This is

10  after Mr. Huggins had already been brutally beaten in the car.

11          Other witnesses describe how Mr. Negrinelli assisted

12  in applying burning hot wire to Mr. Huggins' body during this

13  torture in the shed.

14          In the aftermath, other co-conspirators took the body

15  and dumped it in a field, and this defendant and two other

16  codefendants drove away from the scene together in a separate

17  vehicle.  In that ride, they disposed of murder weapons -- that

18  is, they threw bats into brush off the side of the road.

19          THE COURT:  Baseball bats?

20          MS. BOLSTAD:  Yes, Your Honor.

21          THE COURT:  Thank you.

22          Counsel?

23          MR. SCHINDLER:  Good morning, Your Honor.

24          THE COURT:  Good morning.

25          MR. SCHINDLER:  Matt Schindler, and this is Dianna

1    Gentry, and this is Ryan Negrinelli, Your Honor.

2            A couple of points of clarification, just to respond

3    to some of the remarks from the government.  One relates to the

4    issue of this matter being heard before two prior judges.  I

5    appeared at Mr. Negrinelli's initial arraignment and made an

6    off-the-cuff at the time, no information, no pleading, no

7    nothing argument to the judge, seeking his release based on the

8    fact that he has no criminal history, he's a single father, he

9    has long-term ties to the community, and at that point I had no

10   information indicating he had done anything.

11           So we had that initial hearing and he's ordered

12   detained.  The following Tuesday -- so that was on a Thursday.

13   The following Tuesday, I appeared again on his behalf, seeking

14   his release.  Again, at this point in time, I had not been able

15   to collect any information on his behalf.  Nothing had been

16   developed.  There was no record.  I didn't supply any

17   pleadings.  There was no letters of support.  There was

18   nothing.

19           So -- and then my recollection was, when I came to

20   Mr. Hause's release hearing was that the Court asked the

21   release hearings in this case be held in front of it going

22   forward.  And so that's why we're here, Your Honor.  That's how

23   we got here.

24           So the first one to actually consider any substance

25   whatsoever regarding Mr. Negrinelli's history, character,

1   background, circumstances is Your Honor, is this Court here

2   today.

3           So the second thing is that the government and

4   Mr. Negrinelli fundamentally agree on one thing, that

5   Mr. Huggins was murdered, and he was murdered by their star

6   witness, their star witness.  And that's the person that you

7   and that jury is going to have to believe in order to convict

8   this man.  And I find the notion that the United States of

9   America would allow someone who tortured and murdered and beat

10  to death somebody, anybody, even someone like Bobby Huggins,

11  would be able to plead guilty to racketeering as a mechanism

12  for leveraging that cooperation, that statement into a

13  situation where they don't have to be responsible for beating

14  someone to death is outrageous.  It's outrageous.  And I think

15  those 12 people are going to find it outrageous.

16          And so the government can come in and talk about

17  witness statements, but we've seen one -- one -- and that one

18  is the statement of the murderer, Tiler Pribbernow.  Yeah, he

19  killed this guy.

20          And also, I find to some extent the government's

21  indignation about the nature of this case, the horror that this

22  all represents, run a Google search for the Warm Springs Indian

23  Reservation and the word "murder," and you see what you come up

24  with.  An appalling record of homicides, of torture, rapes and

25  murders that have taken place on that reservation, and they

1  haven't threatened the death penalty a single time.  They walk

2  into this room, they trot these guys in here and say, "We're

3  going to execute you unless you start talking."  That's what

4  they said.  That's what they said to Pribbernow.  That's how

5  we're here.

6          This man wasn't charged in two years of state court.

7  The case sat around over there in a Dumpster file, waiting for

8  somebody to do something.  That's not a strong federal case,

9  Your Honor.  That isn't a compelling set of evidence.  I didn't

10 hear cell phone data that puts Mr. Negrinelli at the scene.  I

11 didn't hear any physical evidence, DNA evidence.  He supposedly

12 beat someone.  Where is the DNA evidence?  Where is anything

13 that -- anything objective, other than paid compensated

14 witnesses saying, yeah, he did it?  Now, the --

15         THE COURT:  What is the status of the state charge?

16         MR. SCHINDLER:  It was dismissed a week before they

17 brought it over here, after two years, Judge.  You were a state

18 court judge.  Would you have let a homicide sit around for two

19 years?  I mean -- and then it comes over here on a racketeering

20 theory, Judge, that makes absolutely no sense.

21         We're not here on a murder case.  We're here on a

22 case where the government has to prove that this individual's

23 mens rea, his agreement, his conspiratorial agreement

24 encompassed a homicide that did nothing to advance -- nothing

25 to advance the objectives of this supposed criminal

1   organization.

2         So, I mean, a strong case, Your Honor?  Remember *Jose*

3   *Mamani-Vidal*?  How about your fingerprints are on the drugs?

4   That's a strong case.  But a person says so is not.

5         And so I appreciate that Ms. Bolstad has managed --

6   the government has managed to beat these defendants with the

7   threat of the death penalty and coming in and pitching them the

8   story they wanted to hear, which is that somehow this murder,

9   which did nothing to advance the interests of the Gypsy Jokers,

10   which was committed by someone who as far as I know wasn't even

11   a member, is a racketeering endeavor, is something that

12   forwarded, advanced, profited, benefited this criminal

13   organization.  There's just no way.

14         So it's more than just simply, you know, he

15   participated in a murder.  It's a very, very special kind of

16   murder, Judge.  And so, you know, it's an interesting dynamic

17   to be involved in a case like this, because the law says you

18   don't get to detain someone just based on what the government

19   says they're accused of.  That's what the law says.  And then

20   you look at Mr. Negrinelli and his background and his

21   circumstances and the level of support.

22         Everyone who is here for Mr. Negrinelli right now,

23   please stand up.

24         (Audience members stand.)

25         MR. SCHINDLER:  This is Hailey (ph).  This is

1   Mr. Negrinelli's daughter, the one he's had sole custody of for

2   14 years.  These are -- this is his family.  This is his

3   mother, Cynthia Negrinelli.

4        THE COURT:  Thank you.  You may be seated.

5        MR. SCHINDLER:  And, Your Honor, I'm sure someone

6   loved Bobby Huggins.  That isn't the point.  The point is

7   whether we are dealing with an individual who under this set of

8   circumstances, with a tri-county restriction on his travel,

9   with electronic monitoring, with no criminal history, with no

10   history of substance abuse can actually be supervised on

11   conditions.  And I think the answer is absolutely, of course he

12   can.  Of course.  We do it all the time.

13        And so I think we have to get past the hysteria in

14   this case of all of these men are responsible.  Listen, Mark

15   Dencklau, the president of this club, didn't order this murder.

16   No one did.  No one ordered anyone to kill Bobby Huggins.

17   Tiler Pribbernow did it because he's a lunatic, that's why.

18        And so to attribute that kind of conduct to this

19   individual with no criminal history, who has never been in a

20   court before -- and also, I just want to respond briefly to the

21   government's reference to Mr. Negrinelli's post-arrest

22   statements.  The very first thing that he did, at least within

23   the first two minutes, is invoke his right to counsel.  And he

24   was told when he did that, "Oh, no, no, no, we can't do that

25   right now.  We got to tell you stuff.  We got to tell you this

1    information."

2          And then they proceed to hammer him for an hour with

3    false information about him, with evidence they don't have.

4    They're hammering him for an hour, and he's telling them,

5    "Listen, I have head injuries, I have memory problems.  I don't

6    know."

7          Finally he invokes his right to counsel again and

8    goes down to a holding cell for hour after hour after hour, and

9    then finally he's recontacted.  And this is late in the

10   evening.  He is recontacted yet again unlawfully by police

11   after he's twice invoked his right to counsel, and they start

12   hammering him.  "You were in the car hitting him, you were in

13   the car hitting him."

14         So this notion that these statements make him guilty

15   of this murder or of racketeering, it's just not borne out by

16   the information that we have, Your Honor.

17         And, you know, in 22 years of doing this, you don't

18   often get called down to represent someone on a murder case, a

19   murder case involving the Gypsy Jokers, and when they called

20   me, I came down and I expected to find someone who was a

21   murderer.  I expected to find someone who was a Gypsy Joker.  I

22   expected to find a case where the moral fulcrum, the emotional

23   reality of the case was so profoundly disturbing that it

24   merited the federal government seeking to execute people.  And

25   now that I'm in it, none of that is true, none of it.

1          Thank you.  Thank you for considering my pleadings.

2    Mr. Negrinelli is here to answer your questions.  If you want

3    to ask him about how he respects this Court's authority or how

4    he would intend to conduct himself on release, he'd answer

5    those questions.

6              THE COURT:  Thank you, sir.

7              MR. SCHINDLER:  Thank you.

8              THE COURT:  Do you wish to respond?

9              MS. BOLSTAD:  Your Honor, I want to respond about the

10   assertion that it's just one witness putting Mr. Negrinelli as

11   involved.

12         That's not accurate.  He is certainly a very

13   important witness who describes Negrinelli's involvement, but

14   the evidence on Mr. Negrinelli is more than that.

15         Let's assume that it was just one witness.  That

16   witness has been very well corroborated by an ongoing

17   investigation.  Let me give you one specific way that that key

18   witness was corroborated.  We always look for ways that a

19   witness can provide us a new lead, evidence that is new to

20   investigators.  And that's exactly what that star witness did.

21   He described a vehicle used by Joseph Folkerts.  That's a

22   co-defendant indicted in this case.  We did not previously know

23   that vehicle was involved.  So investigators took that lead,

24   and Mr. -- the witness, the star witness said, "But that very

25   vehicle was used to dump Huggins' dead body after his murder."

1        Okay.  So we went to look for that vehicle.  We found

2    the vehicle matching Tiler Pribbernow's description, a Chevy

3    Tahoe, had been sold to another family.  Agents did a search

4    warrant for that vehicle and, lo and behold, underneath carpet

5    in the trunk, they found human blood.  That led to the arrest

6    of Joe Folkerts, and in Mr. Folkerts' post-arrest interview, he

7    admitted, "Yes, my vehicle was involved in transporting this

8    dead body and dumping it at a location."

9        The government never would have had that information

10   without this key witness.  That's merely one way in which that

11   witness has been corroborated in an extremely strong way.

12       Moreover, other witnesses who are now coming

13   forward -- and we are in the process of speaking with those

14   witnesses -- also corroborate things that Tiler Pribbernow has

15   said.  And you know what's interesting about their

16   corroboration?  Those witnesses had not yet seen

17   Mr. Pribbernow's statements.  They had not seen them.  But

18   their statements match up almost exactly with his, and those

19   statements put this defendant as being very involved in the

20   murder.

21       So it's not just him, though.  We have phone records

22   of Mr. Negrinelli, his phone records from the time of these

23   events spike on certain key days, and those contacts that he's

24   making with other co-conspirators are spiking on days related

25   to this hunt for Bobby Huggins, as well as on the June 30th and

1    July 1st days.

2         So I want the Court to be aware we're not just

3    relying on one I think purchased witness, as Mr. Schindler

4    describes him as.  There is so much more to that.

5         We'd ask that the Court detain the defendant.

6         I'm happy to answer any other questions you may have.

7         THE COURT:  No, fine.  Thank you.

8         I do have these photographs.  As I understand it,

9    the -- when were these posted?

10        MS. BOLSTAD:  These are from a time period of 2014

11   through 2018.

12        THE COURT:  Well, that's -- my information I have is

13   that he was a prospect member, and then after this event, he

14   became a full member, and then he departed from current

15   membership.

16        MS. BOLSTAD:  That is my understanding.

17        THE COURT:  So he is not a Gypsy Joker at the time of

18   his arrest; is that correct?

19        MS. BOLSTAD:  That's correct according to

20   Mr. Negrinelli, and I don't have anything that disputes that.

21        THE COURT:  Fine.

22        I have -- have a seat.

23        I have evaluated very carefully the material that has

24   been submitted to the Court by both sides.  I have read the

25   proffer that has been provided from Pribbernow that has been

1  provided to defense counsel, and which I have read.  It is not

2  a matter of record.

3          The part of the defendant's participation, at least

4  at this juncture, is that the defendant did, in fact, be

5  involved in the kidnapping of the defendant (sic), in the sense

6  that he was taken into -- against his will and transported from

7  one place to another, and during this process, the defendant

8  engaged in waterboarding, that the victim -- when I talk about

9  the victim, I'm talking about the person who was murdered.

10          That you participated in the waterboarding of him by

11  tying a scarf around his mouth and pouring water in it, that

12  you also struck him, but that the major killing -- the major

13  assault was by Pribbernow with a baseball bat, that that's the

14  information that I have so far.

15          So as far as your alleged confessions, that will

16  await trial to determine whether they are constitutional or

17  not.  I would have to -- that would have to be adjudicated at a

18  later time.

19          The aspects of this case are that your participation

20  was active and part -- an integral part of the detention of the

21  victim and the assaults.  The degree of your involvement will

22  have to be determined at trial.  So I'm going to detain you to

23  determine that.

24          I recognize that you have a very serious head injury,

25  brain injury, that you have had this since you were a child,

1   that you're still suffering from that, and that you are a

2   loving father, the sole custodian of your daughter, who is very

3   devoted to you, and that fortunately your mother is still

4   available to take care of her pending your trial.

5         The business that you tried to start has not matured

6   to the point where you can pay for your own counsel.

7         That's correct, is it not, Counsel?

8         MR. SCHINDLER:  Yes, it is, Your Honor.

9         THE COURT:  Thank you.

10        You've made a request for a highly skilled brain

11  expert -- Just have a seat just a moment -- and that will be

12  addressed after I've heard any opposition to it, but my

13  inclination is that that will be justified in one form or

14  another.  Whether we do it by long distance or in person is

15  another factor.

16        There is no question that you are not a flight risk.

17  Your devotion to your daughter, number one.  You have many

18  friends and supportive people.  Obviously, you're not going to

19  let them down by running somewhere.  I don't know where you'd

20  run.

21        You certainly -- and then as far as intimidation of

22  other witnesses, of these witnesses, you don't know where they

23  are, and further, I don't think that you would be -- that would

24  be part of your participation.

25        But I think the gravity of the offense, that carries

1  up to life imprisonment, or at least substantial periods of

2  time, is the factor that weighs heavily in your involvement in

3  this case.

4        As far as the trial time, I'm very concerned about

5  waiting for the Department of Justice to make up their mind

6  whether they're going to charge a capital murder case, death

7  penalty case or not.  I'm not going to wait for the government

8  to make up your mind -- their mind as to whether they're going

9  to do it.  I'm not going to have these men, presumed to be

10  innocent, sitting in a county jail, waiting for some bureaucrat

11  in Washington, D.C. to make up their mind as to whether they're

12  going to charge or not.  They've had their opportunity.  I'm

13  setting this case for trial in the very near future.

14        Now, assuming that you're not going to be having the

15  death penalty case, when is the first time that the government

16  can be available for trial?  Want to give that some thought?

17        MS. BOLSTAD:  I would like to, Your Honor.  There's

18  been a lot of conversations with the multiple defense teams in

19  this case.

20        THE COURT:  Yes.

21        MS. BOLSTAD:  And I think the opportunity to next

22  address scheduling will be at our May status conference with

23  Your Honor.

24        THE COURT:  Is that satisfactory?  You want to get it

25  tried, too?

1    MR. SCHINDLER:  Absolutely, Your Honor.

2    THE COURT:  And I'm going to see that you get it.

3    MR. SCHINDLER:  I mean, we came in to see you for a

4  status conference, we had one volume of discovery, and six

5  weeks later, and we just are getting our second volume.  So we

6  need to get cranked up --

7    THE COURT:  Sure.

8    MR. SCHINDLER:  -- you know.

9    THE COURT:  I will accommodate you.

10   MR. SCHINDLER:  Thank you.

11   THE COURT:  I just am not going to sit around waiting

12  years.  Last I heard, it might take a year for the government

13  to make up their mind.  That's not going to happen.

14   So we'll get this case tried in a -- as soon as

15  possible.  I hope you'll meet and confer and agree to a trial

16  date.

17   Thank you.

18   MS. BOLSTAD:  Thank you, Your Honor.

19   THE COURT:  Anything further at this point?

20   MS. BOLSTAD:  No, Your Honor.

21   MR. SCHINDLER:  Your Honor, if I might just have a

22  moment with you, maybe back in chambers to discuss some of the

23  expense issues?

24   THE COURT:  Yes, I'd be pleased.

25   MR. SCHINDLER:  Could we do that?

1        THE COURT:  We don't need a reporter for that.

2        MR. SCHINDLER:  No, no, not at all.

3        THE COURT:  Court is in recess.

4        (Proceedings concluded at 12:08 p.m.)

--oOo--


     I certify, by signing below, that the foregoing is a
correct transcript of the record of proceedings in the
above-entitled cause.  A transcript without an original
signature or conformed signature is not certified.



/s/Bonita J. Shumway                August 11, 2019
_____             _____
BONITA J. SHUMWAY, CSR, RMR, CRR    DATE
Official Court Reporter